IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SHARIF A. and SAMIA RABADI,

    Plaintiffs,

v.                                                          CIV 17-1112 JCH-KBM

D R HORTON, INC.,

    Defendant.

# **PROPOSED FINDINGS & RECOMMENDED DISPOSITION**

THIS MATTER is before the Court on Defendant D R Horton, Inc.'s Motion for Summary Judgment, filed on March 9, 2018. *Doc. 20*. Having considered the record, submissions of counsel, and relevant law, the Court recommends that Defendant's motion be **granted in part**.[1]

**I.    Background**[2]

Plaintiffs, both residents of New Mexico and doing business as Star Trust of New Mexico, "were the owners and developers of a certain approved subdivision" called Paradise View in Albuquerque. *Doc. 1-A* ("*1st Am. Compl.*") ¶ 1; *Doc. 35* ("*Rabadi Aff.*") ¶ 3; *Doc. 21* Undisputed Material Fact ("UMF") 1. Plaintiffs owned building lots in Paradise View that the City of Albuquerque had platted and approved for residential

---

[1] Judge Herrera entered an Order of Reference Relating to Bankruptcy Appeals, Social Security Appeals, Prisoner Cases, Non Prisoner Pro Se Cases, and Immigration Habeas Corpus Proceedings on January 3, 2018, referring this case to the undersigned Magistrate Judge "to conduct hearings, if warranted, including evidentiary hearings, and to perform any legal analysis required to recommend to the Court an ultimate disposition of the case." *Doc. 14*.

[2] In accordance with summary judgment standards, the Court recites all admissible facts in a light most favorable to the Plaintiffs as the party opposing the motion. Fed. R. Civ. P. 56; *see also Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). The Court recites only that portion of the factual and procedural history relevant to this motion.

home construction. *Rabadi Aff.* ¶ 3. Defendant "is a Delaware Corporation transacting business in the State of New Mexico as a home builder." *1st Am. Compl.* ¶ 2. In April 2017, the parties "began negotiations for the purchase and sale of" Plaintiffs' building lots. *Rabadi Aff.* ¶ 4. Plaintiffs owned 40 lots and were asking $60,000 per lot. *Id.*

While Plaintiffs preferred to sell all 40 lots together, Defendant only wanted to buy 24 of the lots. *Rabadi Aff.* ¶ 6. Plaintiffs agreed to sell Defendant 24 lots and believed that "Defendant would also purchase certain impact fee credits[,]"[3] worth $71,401.13, that Plaintiffs also owned.[4] *Id.* ¶ 8. The parties signed the Purchase Agreement for the 24 lots on May 11, 2017. *See Docs. 22-1* at 17; *21* UMF 2. The Purchase Agreement is silent on any purported agreement for Defendant to purchase impact fee credits. *See Doc. 22-1*.

On June 16, 2017, Mr. Patrick B. ("Brent") Lesley, Land Manager for Defendant, "prepared and sent [to Plaintiffs] a draft conditional agreement to purchase the impact fee credits . . . ." *Doc. 21* UMF 5; *see also Doc. 22* (*Lesley Aff.*) at 1 & ¶¶ 1, 8. Under the terms of the proposed agreement, Defendant offered to purchase up to $50,000 of

---

[3] "The State of New Mexico . . . has enacted legislation granting counties and municipalities the authority to enact or impose impact fees related to a development." *D.R. Horton, Inc. v. Curb N., Inc.*, Civ. 07-709 MV/RHS, 2007 WL 9706040, at *2 (D.N.M. Oct. 25, 2007) (citing N.M. Development Fees Act, § 5-8-1–43 NMSA 1978 ("the Development Fees Act")). "An 'impact fee' is a 'charge or assessment imposed by a municipality or county on new development in order to generate revenue for funding or recouping the costs of capital improvements or facility expansions necessitated by and attributable to the new development.'" *Id.* at *1 n.5 (quoting § 5-8-2(I) NMSA). "The Development Fees Act also permits cities to grant credits against impact fees to developers who contribute improvements or land in excess of that required for development approval." *Id.* at *2 (citing § 5-8-15 NMSA).

[4] Defendant asserts that the parties had already agreed to the terms of the sale of the 24 lots before Plaintiffs raised the issue of the impact fee credits. *See Doc. 21* UMF 3. Plaintiffs disagree and contend that they agreed to the sale of the lots "with the understanding that the Defendant would also purchase" the impact fee credits. *See Rabadi Aff.* ¶ 8. The Court finds that while there is a genuine dispute about the issue of timing of when Plaintiffs broached the subject of the impact fee credits to Defendant, it does not affect the Court's ultimate recommendation.

Plaintiffs' impact fee credits at 75% of their face value. *Doc. 22-2* at 3. Plaintiffs assert that certain restrictions in the proposed agreement meant that Defendant would only actually purchase approximately $6,000 in impact fee credits. *Rabadi Aff.* ¶ 11.

Dissatisfied with Defendant's offer, Plaintiffs sent a counteroffer on July 19, 2017. *Lesley Aff.* ¶ 9; *Rabadi Aff.* ¶ 11; *Doc. 21* UMF 6. Plaintiffs' counteroffer required Defendant to purchase the whole of Plaintiffs' $71,401.13 in impact fee credits at 75% of their face value. *Lesley Aff.* ¶ 9; *Rabadi Aff.* ¶ 11; *Doc. 21* UMF 6; *Doc. 22-3*. Plaintiffs assert that in a phone call, Mr. Lesley told Mr. Rabadi that "it 'was a done deal.'" *Rabadi Aff.* ¶ 12; *see also Doc. 21-A* at 2 (an August 31, 2017 email from Mr. Rabadi to Mr. Lesley, noting that after Plaintiffs sent the counteroffer, Mr. Lesley "advised [Plaintiffs] that everything was approved and we had a deal").

Around August 14, 2017, Plaintiffs learned that they had approximately $10,000 more in impact fee credits and sent Defendant an offer to purchase these additional credits at a deeper discount.[5] *See Rabadi Aff.* ¶ 14; *Doc. 22-4*. In both of their proposed counteroffers, Plaintiffs included a provision that provided, "[t]he parties acknowledge that this closing must take place before the closing of any other lots sold and closed to the Purchaser in the [Paradise View] subdivision." *Docs. 22-3* at 4; *22-4* at 2. Despite this provision, the parties closed on the Purchase Agreement for the 24 lots on August 18, 2017, without signing or closing on an agreement regarding the impact fee credits. *See Lesley Aff.* ¶ 12; *Doc. 21* UMF ¶ 8. Plaintiffs assert that they "closed on the real

---

[5] Plaintiffs assert that before Mr. Lesley had agreed to the deal, he asked Plaintiffs "to prove that [they] actually had the impact fee credits . . . ." *Doc. 34* at 2. Consequently, Plaintiffs obtained the appropriate paperwork from the City of Albuquerque. *Id.* Plaintiffs assert it was at that point they learned about the extra $10,000 in impact fee credits and offered them to Defendant at a deeper discount. *Id.* at 2–3.

3

estate purchase agreement with the understanding the impact fee agreement would be closed later." *Rabadi Aff.* ¶ 18.

On September 19, 2017, Mr. Rabadi emailed Mr. Lesley and stated:

> I sent you my thoughts on the impact fee deal wherein you would agree to take all my impact fees, i.e. all eighty some thousand. I believe you offer [sic] to take the seventy one thousand, but wished to pay only 50K for them. I made a counter offer, but have not heard from your. [sic] Please let me know one way or other asap.

*Doc. 37-B.* Defendant expressly declined Plaintiffs' second counteroffer (regarding the additional $10,000 in impact fee credits). *Id.*; *see also Rabadi Aff.* ¶ 22. Plaintiffs responded, "Okay, will you let me know what you [w]ill do right away." *Doc. 39-2* at 3. Mr. Lesley shared this email thread with Mr. Dean Anderson, Division President for Defendant. *Doc. 39-2*; *see also Lesley Affidavit* ¶ 6. Mr. Lesley said that he had

> been pretty much ignoring [Plaintiffs'] impact fee issue in favor of more important matters. Here's an email [Mr. Rabadi] sent last week. He emailed a follow up message earlier this week . . . . Every time he has attempted to re-negotiate "the deal" serves as evidence there is no deal, as I see it.

*Doc. 39-2* at 1. Mr. Anderson advised Mr. Lesley to stop responding to Mr. Rabadi's emails. *Id.* at 2.

It is Plaintiffs' understanding that "[j]ust prior to closing on the" Purchase Agreement for the 24 lots, Mr. Lesley reneged on the parties' oral agreement for Defendant to buy $71,401.13 in impact fee credits at 75% of face value, because he had not secured corporate approval. *See Doc. 21-A* at 2; *Rabadi Aff.* ¶ 15. Plaintiffs assert that they would not have sold Defendant the 24 lots, which were the biggest lots Plaintiff owned, if Plaintiffs knew that Defendant would not purchase the impact fee credits. *Rabadi Aff.* ¶ 23. Before Defendant decided to buy only 24, as opposed to 40,

lots, Plaintiff "advised the other builders in the subdivision who had options for first refusal on the balance of the lots . . . that they were all sold . . . ." *Id.* ¶ 24. Consequently, the builders "sold their models and moved out of the subdivision, forcing . . . Plaintiffs[] to close on the 24 larger lots and to find other buyers for the balance of the unsold lots" at a reduced price. *Id.* Plaintiffs are now stuck with over $81,000 in impact fee credits and have no other subdivisions on which to use them. *Id.* ¶ 25.

## II. Summary Judgment Standard of Review

Summary judgment is appropriate when the Court, viewing the record in the light most favorable to the nonmoving party, determines "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). A fact is "material" if it could influence the determination of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if a reasonable trier of fact could return a verdict for either party. *Id.* The moving party bears the initial responsibility of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the moving party meets this burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)) (quotation marks omitted). The party opposing a motion for summary judgment "must set forth specific facts showing that there is a genuine issue for trial as to those

dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990) (citing *Celotex*, 477 U.S. at 324). Rule 56(c) provides that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). The respondent may not simply "rest on mere allegations or denials of [her] pleadings." *Anderson*, 477 U.S. at 259; *see also Otteson v. United States*, 622 F.2d 516, 519 (10th Cir. 1980) ("However, once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.") (quotation omitted)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." *Colony Nat'l Ins. Co. v. Omer*, No. 07-2123-JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008) (citing Fed. R. Civ. P. 56(e); *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006)). "In a response to a motion for summary judgment, a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988) (citations omitted).

### III. Analysis

Defendant argues that it is entitled to summary judgment on all four of Plaintiffs' claims, as well as on any breach of contract claim Plaintiffs could (but did not explicitly) bring in their First Amended Complaint. *See Doc. 21.*

### A. Count I: Promissory Estoppel

Plaintiffs make a claim for promissory estoppel in Count I of their First Amended Complaint. *See 1st Am. Compl.* ¶ 16. New Mexico courts require a plaintiff claiming promissory estoppel to show:

> (1) An actual promise must have been made which in fact induced the promisee's action or forbearance; (2) The promisee's reliance on the promise must have been reasonable; (3) The promisee's action or forbearance must have amounted to a substantial change in position; (4) The promisee's action or forbearance must have been actually foreseen or reasonably foreseeable to the promisor when making the promise; and (5) enforcement of the promise is required to prevent injustice.

*Mendoza v. Honeywell Tech. Sols., Inc.*, No. 07-CV-124 WJ/RHS, 2008 WL 11322912, at *12 (D.N.M. Apr. 23, 2008) (quoting *Strata Prod. Co. v. Mercury Expl. Co.*, 916 P.2d 822, 828 (1996) (internal citations omitted)). Here, Defendant argues that Plaintiffs have failed to demonstrate the third element – that Plaintiffs substantially changed their position in reliance on any promise by Defendant to purchase any impact fee credits. *Doc. 21* at 3.

Plaintiffs contend that if they had known Defendant did not intend to purchase the impact fee credits, Plaintiffs would not have allowed Defendant to "cherry pick" the best 24 lots in the subdivision, which caused them to lose value on the remaining 16 lots. *See Rabadi Aff.* ¶¶ 23-24. Plaintiffs assert that they only agreed to the sale of the 24 lots "with the understanding that the Defendant would also purchase" their impact fee

credits. *Id.* ¶ 8. Now that Defendant refuses to buy the impact fee credits, Plaintiffs allege they are stuck with credits they are unable to use. *Id.* ¶ 25.

However, Plaintiffs also assert that *prior* to the time Defendant reduced the number of lots it was interested in from 40 to 24, Plaintiffs – of their own volition – "advised the other builders in the subdivision" that the lots were all sold, thus the "builders sold their models and moved out of the subdivision . . . ." *Id.* ¶ 24. As a result, "Plaintiffs were forced to sell the balance of the lots" at a reduced price. *Id.*

Assuming for purposes of this motion that Defendant did make a promise to purchase impact fee credits and knew that Plaintiffs conditioned the sale of the 24 lots on that promise, Plaintiffs have still not presented evidence sufficient to show that they substantially changed their position *in response to Defendant's promise* to purchase the credits. Plaintiffs' admission that they turned the other builders away *before* Defendant ever asked to reduce the sale from 40 to 24 lots, and *before* the parties had any understanding regarding the impact fee credits, is crucial to a determination of this claim. At the time Plaintiffs substantially changed their position by turning the other builders away, Defendant had made no promise to buy the impact fee credits. This fact alone is enough to defeat Plaintiffs' promissory estoppel claim.

It is also important to note what Plaintiffs do *not* allege. Plaintiffs make no allegation that any other builders were prepared to buy their impact fee credits, and that they lost the chance to make those sales by relying on Defendant's promise to buy the credits. Moreover, Plaintiffs do not allege that they have lost all opportunities to sell the impact fee credits to other builders, either builders of their remaining 16 lots or other builders in general. *Cf. Mendoza*, 2008 WL 11322912, at *12 (finding that no reasonable

juror could conclude that the plaintiff substantially changed his position by accepting an employment position with the defendant, because "[a]cceptance of the position . . . did not mean Plaintiff gave up his opportunities to accept or seek other employment").

Moreover, Plaintiffs have not submitted evidence sufficient to support a finding that their reliance on Defendant was reasonable. Plaintiffs made it clear that "they would not close on the land purchase agreement if the impact fee agreement was not signed and closed at the same time as the closing of the purchase of the real estate." *Rabadi Aff.* ¶ 15. Plaintiffs even inserted a provision into their proposed agreements that stated "this closing must take place before the closing of any other lots sold and closed to the Purchaser in" Paradise View. *See Docs. 22-3* at 4; *22-4* at 2. Yet, the parties did not close the agreement for the impact fee credits at the same time as the agreement for the 24 lots. *Cf. Chavez v. Manville Prods. Corp.*, 777 P.2d 371, 374 (N.M. 1989) (finding that "as a matter of law . . . it was unreasonable for [the plaintiff] to change his position in reliance on oral representations contrary to an express term of an employment contract which provided that their agreement could only be modified in writing"). I therefore recommend that the presiding judge find, as a matter of law, it was unreasonable for Plaintiffs to continue to rely on Defendant's alleged promise, where Defendant refused to sign the written impact fee agreement or close on the agreement at the time the parties closed on the 24 lots. For these reasons, I also recommend granting Defendant's motion with respect to Count I.

### B. Count II: Unfair Business Practices

In Count II of their First Amended Complaint, Plaintiffs allege that "[D]efendant has violated New Mexico unfair business practices laws . . . ." *1st Am. Compl.* ¶ 17.

Plaintiffs do not cite any specific laws, but Defendant believes that Plaintiffs are attempting to bring a claim under the Unfair Practices Act (UPA), NMSA 1978, §§ 57-12-1–26. *See Doc. 21* at 5. Plaintiffs do not refute this assertion, and so the Court treats Plaintiffs' claim as one arising under the UPA.

Plaintiffs' UPA claim must fail, however, because they do not have standing to bring such a claim. In *Guidance Endodontics, LLC v. Dentsply International, Inc.*, 708 F. Supp. 2d 1209 (D.N.M. 2010), a seller attempted to bring a UPA claim for unfair practices against a buyer. *See Guidance Endodontics, LLC*, 708 F. Supp. 2d at 1256. The court found that because "a UPA claim may only be based on unfair practices in connection with the sale of goods or services[,] . . . it must be brought by a purchaser, not a seller." *Id.* (citing *Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A., Inc.*, 113 P.3d 347, 352 (N.M. Ct. App. 2005) ("If the legislature had defined an unfair or deceptive trade practice in terms of misrepresentations made in connection with the sale *or purchase* of goods or services, we might be inclined to recognize a claim against Home Depot as a buyer of goods and services.")). As Defendant was the purchaser in this transaction, Plaintiffs do not have standing to bring a claim against Defendant under the UPA. I recommend granting Defendant's motion with respect to Count II.

### C. Count III: Breach of the Implied Covenant of Good Faith and Fair Dealing

Plaintiffs bring a claim for breach of the covenant of good faith and fair dealing in Count III. *1st Am. Compl.* ¶¶ 19–20. "The implied covenant of good faith and fair dealing protects the reasonable expectations of the parties to a contract arising from its terms." *Sanders v. FedEx Ground Package Sys., Inc.*, 188 P.3d 1200, 1202 (N.M. 2008). "[P]arties are liable for breaching the covenant when their conduct frustrates the

'overarching purpose' of the contract by taking advantage of their position to control implementation of the agreement's terms." *Guidance Endodontics, LLC*, 708 F. Supp. 2d at 1281 (quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (internal quotation omitted)). "On the other hand, one cannot assert a breach of the implied covenant for conduct that the contract's express provisions governs." *Id.* (citing *Dunlap*, 878 A.2d at 442*; Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009) ("To the extent that Kuroda's implied covenant claim is premised on the failure of defendants to pay money due under the contract, the claim must fail because the express terms of the contract will control such a claim.")).

While Plaintiffs frame the claim in Count III as one for breach of the covenant of good faith and fair dealing, they are essentially making a claim for non-performance of the agreement – in other words, for Defendant's failure to pay the money due under the parties' agreement. This is simply a claim for breach of contract, not for breach of the implied covenant of good faith and fair dealing.[6] Defendant acknowledged as much when it noted that Plaintiffs had "not set forth a specific cause of action for breach of contract, [but] they do label their First Amended Complaint as one for breach of contract." *Doc. 21* at 8.

To maintain a claim for breach of contract under New Mexico law, a plaintiff must demonstrate: "(1) the existence of a valid and binding contract; (2) the plaintiff's compliance with the contract and his performance of the obligations under it; (3) a

---

[6] Plaintiff's "pro se . . . pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers." *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005) (citing *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (internal citation omitted)).

general averment of the performance of any condition precedent;[7] and (4) damages suffered as a result of defendant's breach." *ABQ Uptown, LLC v. Davide Enters., LLC*, No. Civ. 13-0416 JB/KK, 2015 WL 8364799, at *28 (D.N.M. Oct. 19, 2015) (quoting *McCasland v. Prather*, 585 P.2d 336, 338 (N.M. Ct. App. 1978) (internal citation omitted)).

Defendant argues only that there was never an acceptance of an offer; thus, there can be no breach of contract. *See Doc. 21* at 8. The undisputed facts show that after Mr. Lesley sent an offer to purchase $50,000 in impact fee credits, Plaintiffs sent a counteroffer on July 19, 2017, offering to sell $71,401.13 in impact fee credits at 75% of their face value. *Rabadi Aff.* ¶ 11; *see also Doc. 22-3*. Plaintiffs have come forward with evidence that in a phone call, Mr. Lesley told Mr. Rabadi "it 'was a done deal.'" *Rabadi Aff.* ¶ 12; *see also Docs. 21-A* at 2 (an August 31, 2017 email from Mr. Rabadi to Mr. Lesley, noting that after Plaintiffs sent the counteroffer, Mr. Lesley "advised [Plaintiffs] that everything was approved and we had a deal"); *39-2* at 1 (a September 14, 2017 email from Mr. Rabadi to Mr. Lesley, asserting that "we have made a deal with you to buy $71,000 of impact fee [sic] at 75% and was approved by the president of the company as you said and must be honored"). Defendant neither acknowledges nor disputes this assertion. *See Docs. 37*; *40*. Thus, Plaintiffs have met their burden to provide evidence of an offer with sufficiently definite terms and an oral acceptance of that offer. Thus, this evidence sufficiently creates a genuine dispute of material fact on the issue of whether the parties formed a contract.

---

[7] The Court acknowledges that there was a provision in the impact fee credits purchase agreement that required the parties to close on the contract before the parties closed on the purchase agreement for the 24 lots. *See Doc. 22-3* at 4. The parties did not address this provision, and the Court declines to comment on its import at this time.

While Defendant never disputes Plaintiffs' assertion that Mr. Lesley assured them the agreement was a "done deal," Defendant does argue that Plaintiffs' later offer regarding the additional $10,000 in impact fee credits is evidence that there had been no agreement. *See Doc. 37* at 3-4. Defendant points to Mr. Rabadi's August 31 and September 25, 2017 emails to Mr. Lesley, in which Mr. Rabadi says, "I realized that the agreement was not what I had contemplated and amended the agreement" (*Doc. 21-A* at 2), and later, "You rejected my counteroffer to sell the" remaining $10,000 in impact fee credits "together with the original deal for the larger amount" (*id.* at 4). Defendant fails to note, however, that Mr. Rabadi also reiterated that after he proposed the sale of $71,401.13 at 75% of face value, Mr. Lesley advised him "that everything was approved and we had a deal" (*id.* at 2), and "I can live with the 71K deal" (*id.* at 4).

Viewing the record in a light most favorable to Plaintiffs, the Court finds that a reasonable jury could conclude that after Mr. Lesley accepted Plaintiffs' initial counteroffer regarding the $71,401.13 in impact fee credits, Plaintiffs' offer for the sale of the remaining $10,000 in impact fees was simply an additional offer to modify the contract that Defendant had already accepted. Defendant was free to reject the modification, but its rejection would not have affected the earlier acceptance of Plaintiffs' first offer. *Cf. Superior Concrete Pumping, Inc. v. David Montoya Constr., Inc.*, 773 P.2d 346, 349 (N.M. 1989) (discussing proof necessary to show an oral modification to an oral contract).

In sum, I recommend that the presiding judge construe Count III as a claim for breach of contract, rather than a claim for breach of the covenant of good faith and fair dealing. I also recommend denial of Defendant's motion with respect to Count III, as

Plaintiffs have come forward with evidence sufficient to create a genuine dispute of material fact regarding whether the parties entered into a contract for the purchase of $71,401.13 in impact fee credits.

### D. Count IV: Loss of Market Value

In Count IV, Plaintiffs tries to state a claim for "loss of market value." *1st Am. Compl.* ¶ 21. As Defendant points out, however, loss of market value is not a cause of action, but a measure of damages. *See Doc. 21* at 7; *see also City of Santa Fe v. Komis*, 845 P.2d 753, 759 (N.M. 1992) (discussing the difficulty of proving loss of market value damages "when there are no actual sales of comparable property" in a partial taking condemnation proceeding); Steven L. Schwarcz, *Compensating Market Value Losses: Rethinking the Theory of Damages in a Market Economy*, 63 Fla. L. Rev. 1053 (2011) (discussing loss in market value as a measure of legal damages). Plaintiffs did not respond to Defendant's argument, and the Court considers it waived. I therefore recommend granting Defendant's motion with respect to Count IV.

### IV. Conclusion and Recommendation

In summary, I recommend to Judge Vazquez that she grant Defendant's motion with respect to Counts I (promissory estoppel), II (unfair business practices), and IV (loss of market value). I further recommend that she construe Count III as one for breach of contract, rather than breach of the covenant of good faith and fair dealing. Because Plaintiffs have demonstrated a genuine issue of material fact with respect to whether the parties formed a contract on the purchase of impact fee credits, I recommend that she deny Defendant's motion on the breach of contract claim.

Wherefore,

**IT IS HEREBY RECOMMENDED** that Defendant D R Horton, Inc.'s Motion for Summary Judgment (*Doc. 20*) be granted in part and denied in part as set forth above.

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

_____
UNITED STATES MAGISTRATE JUDGE